Patricia Lynn JOHNSON, Petitioner,

v.

SECRETARY OF HEALTH AND HUMAN SERVICES, Respondent.

No. 92–478V.

United States Court of Federal Claims.

July 18, 1995.

William Charles Carr, Idaho Falls, ID, atty. of record, for petitioner.

Mary Hampton Mason, Washington, DC, with whom was Asst. Atty. Gen. Frank W. Hunger, for respondent.

## OPINION

REGINALD W. GIBSON, Judge:

### INTRODUCTION

Petitioner, Patricia Lynn Johnson, seeks review of the Special Master's Decision denying her compensation under the National Vaccine Injury Compensation Program. 42 U.S.C. § 300aa–10 *et seq.* (1988 & Supp. V 1993) ("Vaccine Act"). Under this program, individuals who have suffered injuries caused by certain vaccines may obtain compensation for their injuries in the United States Court of Federal Claims. *See, e.g.,* 42 U.S.C. § 300aa–13(a). By statute, an Office of Special Masters was created to hear such claims and to determine entitlement as well as the amount (if any) of compensation due. 42 U.S.C. § 300aa–12(c) & (d). We review decisions of the special masters under a highly deferential standard of review, *infra.*

At bar, petitioner is seeking compensation for injuries allegedly caused by a rubella vaccination she received in 1989. After an evidentiary hearing, held on August 24, 1994, Special Master George L. Hastings, Jr., issued a decision denying relief on the grounds that petitioner had failed to prove, by a preponderance of the evidence, that her present condition was in fact caused by the vaccine. Before this court, petitioner presently raises numerous objections to the Special Master's Decision, asking that we find, as a matter of law, that she is entitled to compensation under the vaccine program. We have carefully reviewed petitioner's objections, the Special Master's Decision, as well as the record as a whole in this matter.

Based on this in-depth review, we are constrained to conclude that the special master applied the correct legal standards to petitioner's case. However, we find that the special master was arbitrary and capricious in completely ignoring, without adequate justification, medical opinion evidence, in the form of the reports of a physician, contained in the record. Notwithstanding our conclu-

sion that the special master was arbitrary and capricious, in that connection, we hold that this error was harmless, nevertheless, because the special master did in fact address the limited reasoning contained in the reports and, moreover, because the reports were of little probative value. Therefore, on the record as a whole, we deny the petitioner's Motion for Review. The decision of the special master is, accordingly, affirmed.

## BACKGROUND

### A. Petitioner's Medical History [1]

Ms. Johnson received a rubella vaccination on December 14, 1989. At that time, she was thirty-four (34) years of age. About ten (10) days later, she experienced a reaction to her vaccination and, as a result, went to the emergency room of a local hospital. Her symptoms consisted of a fever, a rash covering much of her body, and generalized body aching, including in her neck and other joints. Based on her distinctive rash, a physician was able to deduce that Ms. Johnson was experiencing a reaction to the rubella vaccine. After several days, the rash, fever, and aches subsided, although petitioner continued to feel weak and tired for a few more weeks. By mid-January, she was more or less back to normal.

Beginning in early April 1990, petitioner experienced burning pain and weakness in her forearms. From late May 1990 to the present, she has continued to experience pain in her muscles and joints along with numbness and tingling, specifically in her hands, elbows, and wrists. From August 1990 on, she has occasionally experienced pain and numbness in her lower extremities as well. Often, petitioner has reported additional symptoms such as sore throat, slight fevers, headaches, swollen glands, and chest pain.

Petitioner did not experience any joint swelling during the first year after her vaccination, but, in January 1991, and again in January, April, and May of 1993, and January 1994, "synovial thickening" (joint swelling) was observed in her wrists and fingers.

As of the hearing, Ms. Johnson continued to report joint and muscle pain and was unable to hold a job or to care for her family fully. She has also suffered from depression.

Finally, petitioner has been diagnosed by several physicians to be suffering from "fibromyalgia syndrome" (FMS). Based on the evidence in the record (see, e.g., Ex. F; Ex. A; Ex. 88), this syndrome is—

a condition in which an individual reports pain and tenderness in many areas of fibrous body tissue, but usually no "objective" evidence of injury or disease can be observed by a physician. This syndrome is often associated, as it is in petitioner, with psychological or psychiatric problems as well. The syndrome's cause is unknown.

Special Master's Decision at 4. In addition, two of Ms. Johnson's treating physicians believe that she also suffers from chronic rubella-associated joint pain, i.e. chronic joint pain which was caused by her rubella vaccination.

### B. Special Master's Decision

The special master began his decision by outlining the issue before him. Specifically, he framed the issue as: "whether petitioner has successfully demonstrated that her symptoms were 'more probably than not' caused by [the rubella] vaccination." Id. at 2. Then, after describing the petitioner's condition, the special master defined some medical terms relevant to his decision. He defined "arthritis" as "objective findings of swelling, redness, heat, and/or limitation of motion" in the joints. Id. at 5. "Arthralgia" was defined as "subjective pain in a joint or joints." Id. "Arthropathy" is a general term for joint symptoms, which covers both arthritis and arthralgia. Id. Finally, the special master distinguished between "acute" and "chronic" phases of arthropathic symptoms in vaccinated individuals. The acute phase occurs between one and several weeks after the vaccination, while the chronic phase refers to symptoms which persist or recur thereafter. Next, the special master went on to discuss the general medical background related to this case.

---

**1.** We do not ordinarily independently find the facts in these cases, but rather simply review the findings of the special master, infra. According-

ly, the facts set forth herein are those found by the special master.

For this medical background, the special master drew heavily on an earlier proceeding ("the omnibus proceeding" [2]) in which he undertook an inquiry into the general relation of the rubella vaccine to chronic joint symptoms. The findings that resulted from the omnibus proceeding were memorialized in an order dated January 11, 1993 ("the January 11 Order"). In pursuance of this inquiry, the special master investigated the relevant medical literature and also heard testimony from various expert witnesses. Based upon this evidence, he found that it was possible that a petitioner *could* prove that it was more probable than not that chronic joint symptoms were caused by a rubella vaccination, but only if she[3] met certain requirements.

The special master, in the decision presently before this court, summarized the results of his inquiry and the impact of his order as follows—

> [A] large number of persons have experienced histories of joint pain which follow a typical pattern. This pattern involves, *inter alia*, the onset of significant, observable swelling in multiple joints between one and six weeks post-vaccine, followed by some period of remission or reduction in symptoms, but still later, by a recurrence or persistence of more joint swelling, or simply pain, in the same joints. In general, I concluded that if a particular petitioner's history of joint symptoms falls into this pattern, and there is no other apparent cause for the symptoms, then one could reasonably—subject to any additional evidence introduced peculiar to the particular case—attribute the chronic symptoms to the vaccination.

*Id.* at 5.

Next, the special master outlined the areas of agreement and disagreement between the experts who testified at the hearing in this case. First, both experts, Dr. Chalmers for petitioner and Dr. Masi for respondent, agreed that the petitioner is accurately diagnosed as experiencing fibromyalgia syndrome. Furthermore, they both agreed that most (at least 80%) of the petitioner's current pain and disability is due to the FMS rather than any independent joint problem. Finally, the experts agreed that petitioner's FMS was not likely "medically" or "directly" caused by the rubella virus. However, the special master also noted that Dr. Chalmers felt that Ms. Johnson had chronic rubella-associated arthropathy in addition to FMS, while Dr. Masi disagreed. Further, Dr. Chalmers believed that the early stages of petitioner's chronic arthropathy indirectly caused, or precipitated, her FMS. Again, Dr. Masi disagreed.

With this background established, the special master then moved on to consider the merits of petitioner's case. He began by noting that the available evidence that the rubella vaccine causes *chronic* joint symptoms is limited and that such a causal link has not been medically proved. Next, he identified several ways in which petitioner's medical history deviated from the typical pattern of chronic rubella-associated arthropathy, as determined at the omnibus proceeding. First, there was no evidence that Ms. Johnson had experienced any observable joint swelling at any time soon after her inoculation. The special master concluded that it was unlikely that she had any significant joint swelling in the first six weeks after the rubella vaccination. This was contrary, held the special master, to the typical pattern in which patients experienced joint swelling during a post-vaccine reaction.

**2.** Special Master Hastings was assigned by the Chief Special Master to resolve approximately 70 cases involving claims of rubella-associated arthropathy. In the interest of speed and efficiency, Special Master Hastings undertook, at the Chief Special Master's request, an inquiry into the general medical issue of the causation of chronic joint symptoms by the rubella vaccine. To this end, the special master reviewed the scientific literature and heard testimony from six expert witnesses.

Petitioner was *not* represented at this proceeding, although two attorneys for other vaccine claimants generally proceeded on behalf of the large group of petitioners. Moreover, the record is devoid of any evidence that the petitioner ever consented in advance to be bound in this *ex parte* procedure for taking evidence to be used in her case.

**3.** Because most of those who have filed claims for chronic rubella-associated arthropathy are women, we adopt the special master's convention of using the feminine pronoun to refer generally to such claimants.

Second, in the typical case of chronic rubella-associated arthropathy, arthritis in the acute phase is followed by chronic arthritis at the same or a lesser level, or by arthralgia only. In this case, the special master found that petitioner's symptoms actually got worse over time, contrary to the normal expectation. That is, petitioner did not experience any joint swelling in the first year after her vaccination, but since that time has experienced several episodes of arthritis. The special master described this as the reverse of the pattern one would normally expect in someone experiencing chronic rubella-associated arthropathy.

Third, the special master found that the presence of an FMS diagnosis in petitioner's case served to distinguish it from the typical case. The special master noted that many of the symptoms of FMS are similar to those of chronic rubella-associated arthropathy. For instance, FMS sufferers often experience the sensation of joint swelling without any swelling being observable. Also, pain in the fibrous tissues adjacent to joints can be mistaken for pain in the joints themselves. Furthermore, the special master found that Dr. Chalmers' opinion that Ms. Johnson also had chronic rubella-associated arthropathy in addition to her FMS was based on Dr. Chalmers' view that she had arthropathic symptoms in March through May of 1990, before she moved on to more classic FMS symptoms. Dr. Masi disagreed on this point, and the special master found the record to be more supportive of Dr. Masi than Dr. Chalmers. Specifically, the special master found that, after the initial reaction to the vaccination, petitioner first experienced burning arm pain and chest pain (FMS symptoms) *before* she experienced any joint symptoms. Thus, the FMS symptoms occurred before any arthropathic symptoms. As a result of these deviations from the normal pattern of chronic rubella-associated arthropathy, the special master held that the petitioner had fallen short of proving that it was more probable than not that she had, in addition to her FMS, an arthropathic condition related to the rubella vaccine.

Next, the special master considered petitioner's contention that her FMS was caused by her rubella vaccination. Again, he found the opinion of Dr. Chalmers to be inconsistent with the facts in the record. Namely, petitioner's FMS symptoms preceded rather than followed her joint symptoms. Thus, the special master discounted Dr. Chalmers' view that the onset of chronic rubella-associated arthropathy triggered or precipitated Ms. Johnson's FMS. Furthermore, he found that the cause of FMS was unknown, so that any attempt to assign a cause without supporting evidence was merely speculative. Therefore, concluded the special master, petitioner failed to show by a preponderance of the evidence that her FMS was vaccine-caused.

Because he found that petitioner had failed to meet her burden of proving that it was more likely than not that her chronic condition was caused by her rubella vaccination, the special master denied petitioner compensation under the National Vaccine Injury Program.

### PETITIONER'S OBJECTIONS

Petitioner makes numerous objections to the decision of the special master. For convenience, we group these objections according to their content. First, petitioner argues that the special master applied the wrong legal standard and burden of proof to this case. In this connection, petitioner contends that the Secretary should have borne the burden of proving that another factor, unrelated to the vaccine, caused petitioner's condition, pursuant to 42 U.S.C. § 300aa–13(a)(1)(B). Petitioner maintains that she met her burden of making out a *prima facie* case of causation and that, therefore, the burden of proof shifted to the respondent. Furthermore, petitioner points out that 42 U.S.C. § 300aa–13(a)(2)(A) provides that a "factor unrelated to the administration of a vaccine" cannot include any idiopathic, unexplained, or unknown condition. Because FMS is a condition of unknown origin, petitioner concludes that the Secretary could not legally meet her burden. Therefore, petitioner asserts that she is entitled to compensation.

Along these same lines, petitioner objects to the standard of proof to which the special master held her. Petitioner contends that

the special master held her to a standard of rigorous proof rather than the generous standard provided for by law. For instance, petitioner alleges that the special master's requirement that she fit into a "typical pattern" was not in accordance with the proper spirit of generosity. Thus, petitioner avers that the special master applied the wrong standard of proof.

Second, petitioner contests the special master's decision as being contrary to the January 11 Order. She also objects to his use of a "typical pattern," arguing that respondent should have been required to prove that petitioner's history deviated from the typical pattern. In this context, petitioner makes several related points. Petitioner contends that, in his decision, the special master required joint swelling during the acute phase of the rubella reaction, while this was not required by the order. In addition, petitioner argues that there is no typical pattern and that, in fact, most cases (including petitioner's) of chronic rubella-associated arthropathy involve only arthralgia in the acute phase. Finally, in this vein, petitioner maintains that the Secretary had the burden of demonstrating the absence of joint swelling during the acute phase.

Petitioner's third general objection relates to the special master's evaluation of the expert testimony and opinions presented at the hearing. Petitioner asserts that the special master gave too much weight to the testimony of respondent's expert, Dr. Masi. Because, petitioner contends, Dr. Masi was not as well qualified as petitioner's expert and had not treated Ms. Johnson, Dr. Masi's testimony is less credible than that of Dr. Chalmers, petitioner's expert. Petitioner also points to certain alleged errors or inconsistencies in Dr. Masi's testimony to buttress this argument. Moreover, petitioner argues that the special master erroneously disregarded the opinion of Dr. Tingle contained in certain reports submitted by petitioner into evidence. While the special master stated that he did not give weight to Dr. Tingle's

opinion because he did not have a chance to hear the reasoning behind it, petitioner maintains that the reports in fact contained Dr. Tingle's reasoning. Thus, concludes petitioner, the special master should have given weight to Dr. Tingle's opinion and reasoning.

Finally, petitioner disputes the factual conclusions contained in the decision of the special master. She contends that the special master was wrong to conclude that her arthropathy was not caused by the rubella vaccine. Contrary to the finding of the special master that petitioner's arm pain preceded her joint pain, petitioner alleges that she experienced neck pain before the arm pain. Furthermore, petitioner argues that many of the same symptoms which she experienced during her acute rubella reaction recurred later on. Therefore, she argues that her chronic joint symptoms are due to the rubella vaccine. In addition, petitioner further contends that her FMS was caused by the rubella vaccine. In support of this position, she points to the fact that her FMS arose after the administration of the vaccine and that a virus can cause FMS.

Based on all of these objections,[4] petitioner asks the court to reverse the decision of the special master and find that she is entitled to an award under the vaccine program.

## STANDARD OF REVIEW

The Vaccine Act provides that:

[ ]the United States Court of Federal Claims shall have jurisdiction to undertake a review of the record of the proceedings and may thereafter—

(A) uphold the findings of fact and conclusions of law of the special master and sustain the special master's decision,

(B) set aside any findings of fact or conclusion of law of the special master found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law and issue its own

---

4. Petitioner also includes an objection listing "many other area's where the Special Master's errors affected his ultimate decisions." P.Br. at 20. We have considered each of these objections and found them to be trivial and/or devoid of merit. Additionally, some of the points raised in this list are raised elsewhere in petitioner's objections and are addressed in connection with those other objections. Accordingly, these points do not merit further discussion.

findings of fact and conclusions of law, or

(C) remand the petition to the special master for further action in accordance with the court's direction.

42 U.S.C. § 300aa–12(e)(2). Thus, the Act "contemplates three distinct levels of review." *Ankenbauer v. Secretary of Health and Human Servs.*, 31 Fed.Cl. 637, 640 (1994). Factual findings are reviewed under the arbitrary and capricious standard; legal conclusions are reviewed under the "not in accordance with law" standard; and discretionary rulings are examined for abuse of discretion. *Id.* (citing *Munn v. Secretary of Health and Human Servs.*, 970 F.2d 863, 870 n. 10 (Fed.Cir.1992)).

■■■ Accordingly, the standard of review in this court is "highly deferential to the factual findings of the special master." *Munn*, 970 F.2d at 869. "Under the arbitrary and capricious standard, the reviewing court should not substitute its judgment for that of the decision maker." *Carter v. Secretary of Health and Human Servs.*, 21 Cl.Ct. 651, 653 (1990) (citing *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 416, 91 S.Ct. 814, 823–24, 28 L.Ed.2d 136 (1971)). Therefore, as long as the special master considers all of the relevant factors, makes no clear error in judgment, and articulates a rational connection between the facts found and the choice made, the decision should be affirmed. *Fricano v. United States*, 22 Cl. Ct. 796, 798 (1991) (citing *Bowman Transp., Inc. v. Arkansas–Best Freight Sys., Inc.*, 419 U.S. 281, 285, 95 S.Ct. 438, 441–42, 42 L.Ed.2d 447 (1974)). With the foregoing standard of review firmly in mind, we now turn to consider petitioner's objections to the special master's decision.

## DISCUSSION

Petitioner's numerous objections may be grouped into four categories. First, petitioner challenges the burden and standard of proof to which the special master held her. Second, Ms. Johnson objects to the use by the special master of a "typical pattern" for chronic rubella-associated arthropathy in evaluating her medical history. Third, she argues that the special master erred in weighing the testimony and reports of the various experts in this case. Finally, she disputes the special master's findings of fact on the issue of causation, contending that they are not supported by the record. Each of these areas is addressed, *seriatim*, below.

Upon review, the court finds that the special master applied the correct burden and standard of proof to this case. Namely, the petitioner was required to prove, by a preponderance of the evidence, that she experienced an injury that was in fact caused by a vaccine. Next, we hold that the special master's findings of fact concerning the typical pattern and petitioner's symptoms were supported by the evidence in the record as a whole and, accordingly, were neither arbitrary nor capricious. Conversely, this court concludes that the special master was arbitrary and capricious in totally disregarding certain medical reports of Dr. Tingle contained in the record. We determine, however, that this error was harmless. Lastly, we find that the ultimate factual conclusions of the special master were neither arbitrary, capricious, nor an abuse of discretion. Accordingly, we affirm the decision of the special master.

### A. Petitioner's Burden and Standard of Proof

■■■ We begin by considering petitioner's burden of proof in this case. Under the vaccine program, there are two ways a claimant can prove that she is entitled to compensation for her injuries. First, a petitioner can attempt to prove entitlement by showing that she received a vaccine listed on the Vaccine Injury Table and that she, thereafter, experienced an injury listed on the table in association with that vaccine within the time provided. *See* 42 U.S.C. § 300aa–11(c)(1)(C)(i). If a petitioner succeeds in making this showing, a presumption arises that the injury was caused by the administration of the vaccine. Such a presumption is rebuttable, however. In order to rebut the presumption of causation, the Secretary must prove, by a preponderance of the evidence, that the injury was caused by factors unrelated to the vaccination. *See* 42 U.S.C. § 300aa–13(a)(1)(B). Cases where this meth-

od of proof is used are often referred to as "Table cases."

■ Alternatively, a claimant under the vaccine program may attempt to prove entitlement to a compensation award by demonstrating actual causation. This method requires proof by a preponderance of the evidence that a vaccine was the cause-in-fact of the petitioner's injury. *See* 42 U.S.C. § 300aa–11(c)(1)(C)(ii). At bar, petitioner argues that, in these "non-Table cases," once a claimant has made out this *prima facie* case, the burden then shifts to the Secretary to show that the injury was caused by factors unrelated to the vaccine, pursuant to § 300aa–13(a)(1)(B). While petitioner is correct that, under the statute, § 300aa–13(a)(1)(B) is literally applicable in non-Table cases, logically, the application of that section fails to add anything to the required analysis.

Initially, we note that the special master is directed to examine the "record *as a whole.*" 42 U.S.C. § 300aa–13(a)(1). In non-Table cases, the special master's first inquiry must be whether, *on the record as a whole*, petitioner has proved by a preponderance of all of the evidence that a listed vaccine caused an injury. 42 U.S.C. § 300aa–13(a)(1)(A). *See also Bunting v. Secretary of Health and Human Servs.*, 931 F.2d 867, 872 (Fed.Cir. 1991) ("causation must be established by a preponderance of the *evidence as a whole.*" (emphasis added)). If he finds that, on the record as a whole, a preponderance of the evidence supports a finding of causation by the vaccine, it is incongruent, as a matter of logic, that a preponderance of the *very same evidence* proves that the injury was caused by "factors unrelated to the administration of the vaccine." 42 U.S.C. § 300aa–13(a)(1)(B). The special master is not directed to segregate the evidence and only consider a portion thereof depending on which phase of the analysis he is undertaking. Rather, whether he is determining "causation-in-fact" or "causation by factors unrelated," he must examine the record as a whole. Therefore, if a claimant succeeds in proving by a preponderance of the evidence that a vaccine caused her injury, it inescapably follows that there is not a preponderance of evidence showing causation by some other factor. No further inquiry into alternate causes is required, and the petitioner is entitled to a program award.[5]

■ On the other hand, if the special master should find on the record as a whole that the petitioner has failed to prove causation-in-fact by a preponderance of the evidence, then the inquiry is also at an end. In analyzing § 300aa–13(a)(1), the Federal Circuit has stated: "when, as here, the special master concludes that a petitioner has *not* demonstrated by a preponderance of the evidence ... causation required under subsection (A), the alternative causation theories of subsection (B) need not be addressed." *Bradley v. Secretary of Health and Human Servs.*, 991 F.2d 1570, 1575 (Fed.Cir.1993). In essence, then, in non-Table cases, the relevant inquiry to be undertaken by the special master is collapsed into a single determination: On the record as a whole, has the petitioner proven, by a preponderance of the evidence, that her injury was in fact caused by the administration of a listed vaccine, rather than by some other superseding intervening cause? *Munn*, 970 F.2d at 865 ("The claimant must prove by a preponderance of the evidence that the vaccine, *and not some other agent*, was the actual cause of the injury." (emphasis added)).[6]

In the case at bar, the special master examined the record as a whole and, on that basis, found that petitioner had failed to prove by a preponderance of the evidence that she suffered from an injury that was caused by her rubella vaccination. This was the correct burden of proof to which to hold petitioner and, consequently, a correct application of the statute.

■ Petitioner argues that because the cause of FMS is unknown, that is, FMS is an

---

5. Assuming, of course, that there are no other defects in the case (*e.g.*, petitioner has over $1,000 in unreimbursed expenses; 42 U.S.C. § 300aa–11(c)(1)(D)(i)).

6. This does not mean that a petitioner must rule out every possible explanation for her injury. Rather, petitioner must simply show, on the record as a whole, that it is more likely than not that her injury was caused by a vaccine.

idiopathic condition, the special master should not have considered the presence of this syndrome when evaluating her proof of causation. This argument is premised on 42 U.S.C. § 300aa–13(a)(2)(A), which reads in pertinent part:

> (2) For the purposes of paragraph (1) [which provides in subsection (B) for rebuttal by the Secretary of petitioner's *prima facie* evidence of causation], the term "factors unrelated to the administration of the vaccine"—
>
> (A) does not include any idiopathic, unexplained, unknown, hypothetical, or undocumented cause, factor, injury, illness, or condition....

However, this provision applies to subsection (B) of § 300aa–13(a)(1). In the case at bar, the special master found that petitioner had failed to prove actual causation as required by § 300aa–13(a)(1)(A). Therefore, he never addressed subsection (B), wherein "factors unrelated to the administration of the vaccine" are mentioned.

As the Claims Court (now Court of Federal Claims) stated in *Hines v. Secretary of Health and Human Servs.*, 21 Cl.Ct. 634, 650 n. 10 (1990), *aff'd*, 940 F.2d 1518 (Fed.Cir. 1991):

> Since the Special Master did not reach the step two inquiry [subsection (B) ] because petitioner failed to meet the step one causation requirement [subsection (A) ], the Special Master's conclusion that [petitioner's injury] is "idiopathic," *i.e.*, its cause cannot be determined, is not in conflict with § 300aa–13(a)(1)(2).

Similarly, in the present action, the special master found that Ms. Johnson failed to prove by a preponderance of the evidence as a whole that her injury was actually caused by the rubella vaccine. Pursuant to the reasoning in *Bradley, supra*, he did not need to go on to consider the issue of whether a preponderance of the evidence established that the petitioner's injury was in fact caused by "factors unrelated" to the vaccine. Accordingly, he was not precluded by § 300aa–13(a)(2)(A) from considering evidence related to petitioner's FMS. The special master simply concluded, based on the evidence as a whole, that petitioner had failed in meeting her burden of proof.

■■■ Finally, petitioner contests the standard of proof applied by the special master in this case, arguing that the standard was too rigorous. When proceeding by the actual causation method (rather than by proving a Table injury), the proof required is proof by a "preponderance of the evidence." 42 U.S.C. § 300aa–13(a)(1)(A). This is, of course, "the traditional standard of proof in civil ... proceedings." *Hines*, 21 Cl.Ct. at 639.[7] In order to prevail, a petitioner must demonstrate that it is "more probable than not" that her injury was caused by the vaccine. *See In re Winship*, 397 U.S. 358, 371, 90 S.Ct. 1068, 1076, 25 L.Ed.2d 368 (1970) (Harlan, J., concurring). This is precisely the standard used by the special master in the case at bar. He repeatedly referred in his decision to the "preponderance of the evidence" standard and the "more likely than not" standard. In short, he simply concluded that petitioner did not meet that standard. There was no legal error in the standard of proof to which the special master held petitioner. He employed the correct standard.

In sum, Ms. Johnson, petitioner at bar, was required to prove that it was more likely than not that her injury was caused by the vaccine. After considering the record as a whole, the special master concluded that petitioner had failed to meet this burden. Accordingly, he denied her compensation. The special master held petitioner to the correct burden and standard of proof. Therefore, there was no legal error in this regard.

---

**7.** While it is true that in enacting the vaccine program's statutory scheme the Congress intended to provide compensation to those with recognized injuries "quickly, easily, and with certainty and generosity," this is the precise reason "that Congress, in its wisdom, decided to permit recovery on a theory of presumed causation under the vaccine injury table." *McClendon v. Secretary of Health and Human Servs.*, 24 Cl.Ct. 329, 334 (1991). At bar, however, petitioner has not alleged a table injury. Therefore, she must prove causation-in-fact under the alternate method of proof provided for by statute. This requires proof by a preponderance of the evidence that a vaccine was the actual cause of petitioner's injury. *See* 42 U.S.C. § 300aa–13(a)(1)(A) (referencing § 300aa–11(c)(1)).

B. *The Omnibus Proceeding and the "Typical Pattern"*

Next, we address petitioner's objections concerning the special master's finding, based on his omnibus proceeding, that individuals suffering from chronic rubella-associated arthropathy normally experience a "typical pattern" of symptoms. In his January 11 Order, the special master found that the following elements, if proved, would establish entitlement to an award:

(1) the petitioner received a rubella vaccine as an adult;

(2) she was free from recurring joint symptoms for three years prior to the vaccination;

(3) she had a positive rubella antibody response following the vaccination;

(4) she experienced the onset of joint symptoms between one and six weeks after the vaccination;

(5) the symptoms either continued for six months or, if they remitted, recurred (in general in the same joints) within one year of the remission; and

(6) there is an absence of another good explanation for the recurrent joint symptoms.

In addition, the special master also noted that the presence of FMS in a petitioner was a complicating factor which might disqualify her for recovery, depending on the evidence to be adduced in a specific case where the issue arose. Order at 13.

From the evidence in the record, it appears that petitioner in this case has met most of the criteria set forth in the special master's order. There is no doubt that she received a rubella vaccination at age 34 on December 14, 1989, and the medical records show no history of joint symptoms prior to that date. The record further indicates that petitioner developed immunity to the rubella virus as a result of her vaccination. Moreover, petitioner went to the emergency room, 12 days after her vaccination, where her symptoms included arthralgia (joint aching) and she was diagnosed as experiencing a reaction to the rubella vaccine. Finally, the medical records demonstrate that, beginning in May 1990, petitioner has experienced various symptoms in connection with her joints.

Despite apparently meeting most of the elements of proof outlined in his January 11 Order, the special master concluded that petitioner had failed to show by a preponderance of the evidence that her injury was actually caused by the vaccine. First, as was explained in the order, the special master noted that petitioner's FMS diagnosis in this case was a complicating factor making it much more difficult to show a vaccine-caused injury. Moreover, the special master noted that the FMS explained many or most of petitioner's symptoms (*see* element (6), *supra*). In fact, as the special master pointed out, the expert witnesses for both parties agreed that nearly all of petitioner's current disability is due to her FMS. As a result, although petitioner may have met most of the minimum requirements of proof contained in the January 11 Order, the presence of petitioner's FMS, combined with the unusual pattern of her medical history, made it less likely that her condition was caused by the vaccine, rather than by the FMS or something else.

In this connection, the special master noted two ways in which petitioner's history made it less likely that the vaccine caused her injury. First, the petitioner experienced only generalized joint aching, and not joint swelling, during the initial reaction to the vaccine. Second, petitioner's symptoms worsened over time with joint swelling present, at the earliest, over one year after the vaccination. Finally, the special master found that petitioner failed to prove that her FMS was vaccine-caused because the medical records did not support the theory of her expert witness on this issue. Thus, the special master denied compensation.

As relates to the above-mentioned decision-making process, petitioner now objects to two aspects of the special master's decision. First, petitioner contends that the special master's January 11 Order did not require joint swelling in the acute phase of the reaction to the vaccine. Thus, petitioner concludes that the special master's finding that she did not experience swelling of the joints in the acute phase was consistent with

the order and that, therefore, it was arbitrary for the special master to require joint swelling in his decision.

However, the decision of the special master did not *require* swelling of the joints during the acute phase. Rather, the special master merely found that the lack of swelling made it less likely than if swelling had been present that petitioner's chronic injury was caused by the vaccine. As the January 11 Order makes clear, there is a greater consensus among the medical experts that chronic arthropathy is vaccine-related if *acute-phase* arthritis is observed. Order at 14–18. While the special master did state in the order that, even if the symptoms were confined to joint pain only in both phases, he still *might* find it more probable than not that the chronic arthralgia was vaccine-caused, this was not conclusively binding on him but was subject to any other relevant evidence introduced in an individual petitioner's case. *See, e.g.,* Tr. 203 (testimony of Dr. Chalmers that recurrent joint symptoms are more frequent when the initial reaction is marked by arthritis rather than merely arthralgia). Finally, we note that, in the January 11 Order, the special master expressly provided that the presence of FMS in a claimant could be a complicating factor and that specific evidence might need to be taken on the issue in a case where it arose. Therefore, given the foregoing, we cannot say that the special master was arbitrary or capricious in finding that the absence of arthritis during the acute reaction made it less likely than it otherwise would have been that petitioner's chronic injury was caused by her rubella vaccination.

■ Second, petitioner maintains that the January 11 Order did not require conformance with a typical pattern to receive a program award and that, in fact, the evidence shows that there is no typical pattern. In this connection, petitioner alleges that there are many cases of chronic rubella-associated arthropathy in which the individual experiences only arthralgia during the acute phase. Furthermore, she argues that she experienced arthralgia in both the acute and chronic phases and did not, as the special master found, experience the "reverse pattern." Thus, petitioner concludes that the special master was arbitrary in finding that her symptoms were the reverse of the typical pattern and that, as a consequence, it was less likely that her chronic condition was the result of the rubella vaccine.

Again, petitioner's objection is without merit. The evidence in the record amply supports the findings of the special master. To begin with, petitioner's own expert, Dr. Chalmers, testified that her symptoms were substantially worse four years after the vaccination than they were during the acute phase of her reaction and that this was contrary to the normal pattern he had observed in cases of vaccine-related arthropathy and, furthermore, was unlike any other case he had seen. Furthermore, petitioner introduced into evidence an information sheet on "chronic rubella viremia" from the University of British Columbia, Vaccine Evaluation Center, prepared by Dr. Aubrey Tingle. According to this sheet, patients who experience chronic vaccine-related symptoms "generally undergo a slow gradual improvement, although symptoms may continue for several years or more ... It is unusual for symptoms to progress or become more severe with time." Ex. 4, p. 20.

Therefore, the special master reasonably concluded that typically, in cases of chronic rubella-associated arthropathy, patients experience an acute reaction comprised of either arthritis or arthralgia followed by a recurrence or persistence of the symptoms at the same or a reduced level of intensity.[8] Thus, it follows that, where an individual experiences only arthralgia in the acute phase, one should expect her to exhibit only chronic joint pain (at the same or a reduced level), but not chronic joint swelling. The

8. This conclusion is strongly supported by the research discussed by the expert witnesses at the "omnibus proceeding" convened by the special master. These studies show chronic rubella-associated arthropathy in patients with acute arthritis or arthralgia and then chronic arthralgia. In addition, patients have been found to have chronic rubella-associated arthropathy when they have experienced acute-phase arthritis followed by chronic arthritis. However, no expert testified to having seen a study in which a patient had only arthralgia in the acute phase and then arthritis in the chronic stage, *i.e.* petitioner's pattern. January 11 Order at 14–16.

evidence also indicated that, typically, those with chronic rubella-associated arthropathy experience chronic symptoms at the same or a reduced level as compared to the acute phase. Furthermore, in such individuals, it is unusual for symptoms to become worse over time.

The special master methodically examined the record and concluded that petitioner reported joint pain during the acute phase, but that no joint swelling occurred. Petitioner does not dispute this finding. Moreover, the record clearly indicates that Ms. Johnson experienced periodic joint swelling from about one year after her vaccination onwards. Finally, in the petition itself, petitioner admits that "[t]he symptoms have not been lessening, but have in fact been worsening with time." Petition ¶ 9 (sworn statement of petitioner). *See also* Ex. 4, p. 37; Ex. 8, p. 3 (affidavit of Dr. Avondet). Accordingly, the special master concluded that petitioner's medical history (especially as regards her joint symptoms) is the reverse of what is typical in cases of chronic rubella-associated arthropathy. Based on this finding, he further concluded that, because Ms. Johnson's history deviated significantly from the typical pattern, it was less likely that her condition was caused by the rubella vaccine. This conclusion is reasonable, supported by the record, and neither arbitrary nor capricious.

Therefore, the special master's findings concerning the typical pattern evinced by those with chronic rubella-associated arthropathy and the symptoms of petitioner, as well as the reasonable inferences he drew therefrom, were neither arbitrary, capricious, nor an abuse of discretion. We must, accordingly, reject petitioner's related objections.[9]

## C. *Expert Opinions and Testimony*

Petitioner's third group of objections relates to the weight that the special master accorded to the various expert opinions introduced into the record. First, petitioner contends that the special master gave too much weight to the testimony of respondent's expert, Dr. Masi. In this connection, she alleges that the experts for the petitioner were more qualified and more credible than Dr. Masi. Moreover, she argues that Dr. Masi was "less credible" due to certain "inconsistencies" in his testimony. In addition, petitioner maintains that the special master should have given more weight to the diagnosis and opinion of Dr. Avondet because he was her treating physician. Finally, she charges that the special master should not have disregarded the opinion of Dr. Tingle as contained in his medical reports. For these reasons, Ms. Johnson asserts that the decision of the special master was arbitrary and capricious.

### 1. *Dr. Masi's Testimony*

 With regard to Dr. Masi, petitioner essentially argues that the special master should have weighed the expert testimony differently. However, pursuant to our reviewing authority, we do not reweigh the evidence. Rather, we must uphold findings that are not arbitrary or capricious, even if we would have found the facts differently. As the Federal Circuit stated in *Munn*, 970 F.2d at 871, "we do not examine the probative value of the evidence or the credibility of the witnesses. These are all matters within the purview of the fact-finder [*i.e.*, the special master]." There was nothing arbitrary or capricious in the way in which the special master evaluated the expert testimony of Dr. Masi. Therefore, we must uphold his findings as relates to such evidence.

First, Dr. Masi was qualified as an expert witness to testify about all of the medical issues at bar. At the hearing, Dr. Masi was accepted as an expert in rheumatology and fibromyalgia without objection from petitioner's counsel. *See* Tr. 150 conceding FMS expertise. Any issue concerning the relative qualifications of the various experts goes to the weight ascribed to those opinions. But, as noted above, questions concerning the

---

9. We also note, in this connection, that petitioner asserts that the respondent should have borne the burden of establishing that petitioner's history deviated from the "typical pattern." As was explicated above, the petitioner bore the burden of proving, by a preponderance of the evidence, that her chronic injury was caused by the rubella vaccine. The special master correctly applied this standard. Therefore, petitioner's objection in this regard is without merit.

weight given to evidence are within the special master's purview. "It is, after all, the special masters to whom Congress has accorded the status of expert, entitling them to the special statutory deference in fact-finding normally reserved for specialized agencies." *Munn*, 970 F.2d at 871. Indeed, the special master is not bound to follow the opinion of an expert witness and may even reject an expert's testimony when a reasonable basis for doing so is explicated. 42 U.S.C. § 300aa–13(b)(1). *See also Woodard v. Secretary of Health and Human Servs.*, 31 Fed. Cl. 617, 624 (1994).

Next, petitioner points to a number of alleged inconsistencies in the testimony of Dr. Masi and concludes that he is "less credible" than the other experts in this case. However, "credibility determinations are 'virtually unreviewable.'" *Bradley*, 991 F.2d at 1575. Furthermore, these alleged errors were not central to the special master's ultimate conclusions. The special master was entitled to weigh the testimony and other evidence and to draw reasonable inferences. We cannot substitute our judgment for that of the special master when he has considered the evidence and weighed it accordingly. Thus, we are constrained to hold that the special master's evaluation of Dr. Masi's expert opinion in this matter was neither arbitrary, capricious, nor an abuse of discretion.

### 2. *Dr. Avondet's Opinion and Diagnosis*

■ Additionally, the special master found the opinion of Dr. Avondet (specifically, his diagnosis of chronic rubella-associated arthropathy), petitioner's treating physician, to be less persuasive than that of Dr. Masi. The special master explained that, while he had no reason to doubt that Dr. Avondet's treatment had been exemplary, he was not a specialist in the relevant area of medicine, which is on the "frontier of medical knowledge." Because, even among experts, knowledge was very limited concerning a causal relation between the rubella vaccine and chronic joint symptoms, the special master found the opinions of the specialists to be more persuasive than that of Dr. Avondet. Given the deference we must show to the special master's weighing of the evidence, as

well as the reasonable grounds given by him, we conclude that his evaluation of Dr. Avondet's opinion was neither arbitrary, capricious, nor an abuse of discretion.

### 3. *Dr. Tingle's Medical Reports*

With respect to the opinion of Dr. Tingle, which petitioner alleges was improperly discounted by the special master, the special master explained that he had not had a chance to hear Dr. Tingle's reasoning behind his opinion *in this particular case*, although Dr. Tingle had testified generally at the omnibus proceeding. Furthermore, the special master continued, Dr. Tingle was a close colleague of Dr. Chalmers, who did testify at the hearing, and the two had worked in partnership studying the relation of rubella vaccines to arthropathy. Based on these facts, the special master concluded that Dr. Tingle's reasoning was most likely the same as that of Dr. Chalmers. Therefore, he found Dr. Tingle's opinion less persuasive than that of Dr. Masi for the same reasons that he found Dr. Chalmers' opinion less persuasive (*i.e.*, the factual premises of the opinion were unsupported by the record).

Petitioner, however, argues that the special master did have an opportunity to evaluate Dr. Tingle's particular reasoning in the form of the reports which were in evidence. An analysis of these two reports reveals that, while they are quite conclusory, they do contain some reasoning on the part of Dr. Tingle as to why he believes petitioner suffers from a vaccine-caused injury. For instance, in his first report, Dr. Tingle states that his opinion that the rubella vaccine caused petitioner's recurring symptoms is made "[o]n the basis of the clinical history and pattern of disease." Ex. 8, p. 33. Dr. Tingle describes this clinical pattern as "[t]he clearing of the initial attack with a subsequent flareup and recurring symptoms." *Id.* at 32. Additionally, Dr. Tingle notes that petitioner's present condition (as of May 6, 1991) was consistent both with chronic rubella-associated arthropathy as well as FMS and, further, that he has seen this clinical picture in at least 20 other cases. Dr. Tingle's second report (dated March 8, 1993) reveals similar, if not identical, reasoning. Thus, it seems clear

that these reports do in fact contain at least some minimal amount of reasoning supporting Dr. Tingle's opinion in this particular case.

■ Because Dr. Tingle's medical reports contain some reasoning in support of the medical opinion contained therein, it was arbitrary and capricious for the special master to *totally* disregard or ignore the opinion of Dr. Tingle based on the proffered reason that he had not heard Dr. Tingle's reasoning. While it is true that live testimony and questioning at a hearing would have more fully explicated Dr. Tingle's opinion, this does not give the special master license to completely discount the opinion contained in medical reports where that opinion is supported by at least some reasoning. We observe, in this connection, that this is not a case where the evidence offered by the petitioner is completely conclusory. *See Hines*, 21 Cl.Ct. at 646 (holding that a special master is entitled to give little weight to the conclusory affidavit of a doctor which contained no additional supporting facts). Because Dr. Tingle's reports contained some measure of reasoning and supporting facts, the special master should have confronted the opinion and reasoning contained therein when weighing the evidence. His failure to do so was arbitrary and capricious.

■ Moreover, we find that the special master's second stated reason for completely discounting Dr. Tingle's opinion was also arbitrary and capricious. The special master felt that Dr. Tingle's reasoning behind his opinion (*i.e.* that petitioner's current condition was vaccine-caused) must have been the same as Dr. Chalmers' since the two have been close colleagues at the same university and undertaken research together. This conclusion on the part of the special master was unsupported by substantial evidence. Simply because the two men have worked closely together does not, *ipso facto,* mean that their opinions are the same concerning a specific patient. Furthermore, the reasoning and opinions expressed in the two reports is different from and somewhat at .odds with the opinion expressed by Dr. Chalmers in testimony.

As the special master concluded, Dr. Chalmers' opinion that petitioner has chronic rubella-associated arthropathy was based on his view that petitioner experienced arthropathic symptoms in March 1990 before the onset of FMS symptoms. By contrast, Dr. Tingle's opinion is based on petitioner's "clinical history." Ex. 8, p. 33. In describing this history, Dr. Tingle notes that in March 1990 petitioner experienced a variety of symptoms including fatigue and chest pain, "with no specific joint complaints . . . at that time." *Id.* at 31. In May 1990, he goes on to explain, petitioner was seen by Dr. Avondet for burning arm pain, and "[s]hortly after this she also began to have symptoms involving her toes, with pain noted in the left and right shoulder as well as in elbows." *Id.* Thus, Dr. Tingle's opinion is based on a view of the clinical history that is decidedly different from Dr. Chalmers' view. Dr. Chalmers' believed that petitioner's arthropathic symptoms (*i.e.* joint symptoms) preceded her FMS symptoms (*e.g.,* fatigue and burning forearm pain). By contrast, Dr. Tingle describes petitioner's history in precisely the opposite order. The special master discounted the opinion of Dr. Chalmers because he found that it was premised on facts inconsistent with the medical record. The reports of Dr. Tingle support the special master's finding in this regard. Therefore, it was arbitrary and capricious for the special master to completely discount Dr. Tingle's opinion for the same reason that he discounted that of Dr. Chalmers.

### 4. *Harmless Error*

■ Having concluded that it was arbitrary and capricious for the special master to disregard the opinion of Dr. Tingle without separately evaluating and weighing said opinion, this court is convinced that the error was harmless. First, the limited reasoning supporting Dr. Tingle's opinion was considered elsewhere in the special master's decision and, ultimately, rejected. Dr. Tingle based his opinion on petitioner's clinical history which he described as "[t]he clearing of the initial reaction with a subsequent flareup and recurring symptoms since that time [which] is typical for . . . chronic rubella-associated arthropathy syndrome." Ex. 8, p. 32. The

special master agreed that this general pattern was typical for chronic rubella-associated arthropathy. However, he found that petitioner's history deviated in certain respects from the typical pattern when one analyzed the specifics of her symptoms, complaints, and condition. Dr. Masi's opinion, which the special master found persuasive, was based on a more detailed analysis of petitioner's clinical history than the generalized opinion and reasoning of Dr. Tingle.

Secondly, Dr. Tingle apparently believes that petitioner's FMS was caused by the rubella vaccine. However, he provides no explanation as to why he believes this to be the case. Rather, he merely states that he has seen 20 cases in which patients have both FMS and chronic rubella-associated arthropathy. There is no evidence as to what percentage of the total number of cases these 20 represent. Furthermore, the mere association of two conditions in a patient does not prove that they were caused by the same thing. Finally, Dr. Masi, an expert accepted by the court without objection as having a special competency in FMS, testified that petitioner's FMS was not caused by the rubella vaccine. Thus, Dr. Tingle's reports add little significant evidence on the issue of whether petitioner's FMS was vaccine-caused.

Moreover, evaluating the evidence in the record as a whole, including the reports of Dr. Tingle, petitioner has not shown by a preponderance of the evidence that her injury was vaccine-caused. First, petitioner has been repeatedly diagnosed as suffering from FMS. Both witnesses at the hearing agreed that most of Ms. Johnson's current disability is due to her FMS. Dr. Chalmers believed that petitioner began to have chronic rubella-associated arthropathy in March or April 1990, which then triggered her FMS. However, the records indicate that petitioner first experienced the fatigue and burning forearm pain associated with FMS before she had any joint-specific complaints. As noted above, Dr. Tingle's reports do not explain, at least with any detail or precision, why he believes petitioner's FMS was caused by the rubella vaccine. Thus the only significant medical explanation of how petitioner's FMS could

have been caused by the rubella vaccine (*i.e.* that of Dr. Chalmers) was not in accord with the facts as contained in the record. Therefore, the special master determined that petitioner failed to prove by a preponderance of the evidence that her FMS was vaccine-caused.

Furthermore, a preponderance of the evidence also supports the special master's conclusion that petitioner failed to show that she has a vaccine-caused condition in addition to her FMS. In this connection, the evidence showed that petitioner's clinical history, although superficially similar to the normal course or pattern for chronic rubella-associated arthropathy as noted by Dr. Tingle, deviated significantly from the typical pattern. The petitioner's initial reaction to the vaccine was not marked by arthritis in specific joints as is typical in cases where a patient develops chronic rubella-associated arthropathy. Moreover, petitioner's symptoms moved from arthralgia (subjective pain in a joint) during the initial reaction to observable arthritis (objective finding of swelling) only after more than a year and generally worsened. This is the opposite of what specialists expect to see in a patient with chronic rubella-associated arthropathy. Moreover, after a single observation of joint swelling in 1991, the next observed case of arthritis was two years later in 1993, more than three years after the vaccination. Dr. Masi testified that, given the long gap between petitioner's initial reaction and these objective findings, one could not say that her joint symptoms were caused by the vaccine. Therefore, the special master found that the petitioner had failed to prove by a preponderance of the evidence that she suffered from a condition that had been actually caused by her rubella vaccination.

Because Dr. Tingle's reports do not contain evidence that is sufficiently detailed or probative of the causation issue to change the outcome determined by the special master, and because the special master considered the essential reasoning contained therein in making his findings, his failure to separately consider the reports was harmless error. Therefore, we conclude that, although the special master was arbitrary and capricious

in completely ignoring Dr. Tingle's reports on the grounds given, the error was harmless.

### D. Objections to the Special Master's Factual Conclusions

Lastly, petitioner objects to the special master's two principal factual conclusions. She asserts that the record shows that her chronic arthropathy was caused by the rubella vaccine and that her FMS was caused by the onset of her chronic joint symptoms. Thus, she contends that the special master's decision to the contrary was arbitrary and capricious.

■ First, petitioner argues that the special master ignored the recurrence of lymph node swelling, as well as other symptoms, in both the acute and chronic phases of her condition. In addition, petitioner notes that, after the acute reaction, she experienced lymph node swelling before the onset of burning arm pain in April 1990. Based on these symptoms, petitioner wishes the court to draw the inference that she suffered from chronic rubella-associated arthropathy before the onset of her FMS and also that her FMS was caused by the onset of the chronic condition.

■ Where, as here, a petitioner is attempting to establish that a certain vaccine actually caused an injury, proof of causation requires "proof of a logical sequence of cause and effect showing that the vaccination was the reason for the injury." *Knudsen v. Secretary of Health and Human Servs.*, 35 F.3d 543, 548 (Fed.Cir.1994). Furthermore, "[t]his 'logical sequence of cause and effect' must be supported by a sound and reliable medical or scientific explanation." *Id. See also* H.R.Rep. No. 99–908, 99th Cong.2d Sess. pt. 1, at 15, reprinted in 1986 U.S.Code Cong. & Admin.News 6344, 6356 ("Evidence in the form of scientific studies or expert medical testimony is necessary to demonstrate actual causation...."). At bar, petitioner has not pointed to any medical explanation in the evidence for the conclusions she asks us to reach. Petitioner attempts to substitute argument (*e.g.*, "it must logically and legally follow that ..." P.Br. at 17) for sound and reliable medical or scientific explanations. She has pointed to no expert testimony concerning, for instance, the relevance of lymph node swelling. Without a *medical* explanation, petitioner cannot prevail on her burden.

■ Second, petitioner argues that her FMS was caused by the rubella vaccination. Essentially, she argues that because the FMS occurred after the administration of the rubella vaccine, without any intervening event, it must necessarily be the result of the vaccine. This "causation argument is based on a type of reasoning generally referred to as 'post hoc ergo propter hoc' reasoning (after this, therefore on account of this), which is regarded as neither good logic nor good law." *Fricano*, 22 Cl.Ct. at 800. *See also Carter v. Secretary of Health and Human Servs.*, 21 Cl.Ct. 651, 654 (1990) ("temporal association alone is not sufficient to establish causation-in-fact"). Petitioner argues that the first event in a causal chain can be regarded as the cause of the final result even if other causally connected events intervene. This may be true. However, the problem for petitioner is that she has failed to establish the causal links necessary to form a chain. While petitioner is correct, and the special master acknowledged, that FMS could theoretically be caused by the rubella vaccine, she simply failed to carry her burden of proving that it was more likely than not that her FMS was in fact caused by the vaccine.

The special master considered the relevant evidence, including Dr. Chalmers' testimony. Dr. Chalmers felt that the FMS was caused by the onset of chronic rubella-associated arthropathy. However, the special master found, and the record supports, that petitioner's FMS symptoms preceded her arthropathic symptoms. Therefore, he concluded that Dr. Chalmers' explanation was premised on inaccurate facts. Consequently, he held that petitioner had not met her burden. This was a rational and reasonable conclusion, and not arbitrary or capricious.

Thus, although petitioner may disagree with the special master's ultimate resolution of the factual issues at bar, she has not shown the special master's findings of fact to be arbitrary or capricious or an abuse of

discretion. The special master carefully considered the record and the medical opinions. He weighed the evidence and determined that petitioner had failed to prove by a preponderance of the evidence that her chronic symptoms were caused by the administration of the rubella vaccine. We cannot substitute our judgment for that of the special master where his findings were neither arbitrary, capricious, nor an abuse of discretion.

## CONCLUSION

For the foregoing reasons, we conclude that, although the special master was arbitrary and capricious in completely discounting the opinion of Dr. Tingle contained in his reports, the error was harmless. Accordingly, the decision of the special master must be affirmed.[10] Therefore, petitioner's Motion for Review is hereby DENIED. The Clerk shall enter judgment for the respondent.

IT IS SO ORDERED.

---

10. We note that were our highly deferential standard of review otherwise, the result that we would have reached might very well be otherwise. In particular, the court is quite concerned about the apparent lack of consent on the part of petitioner to the taking of evidence to be used in her case at an *ex parte* hearing (the "omnibus proceeding"), the findings of which were embodied in the January 11 Order. *See*, note 2, *supra*, and accompanying text. In the court's mind, this situation raises serious issues of fundamental fairness and procedural due process.

However, we observe that the petitioner has never objected to the *ex parte* nature of the so-called "omnibus proceeding" undertaken by the special master. Furthermore, under Vaccine Rule 8(f)—

Any fact or argument not raised *specifically in the record before the special master* shall be considered waived and cannot be raised by either party in proceedings on review of a special master's decision.

In response to the January 11 Order, the petitioner filed a "Supplemental Rubella Filing" on May 10, 1993. This filing contains no objection to the omnibus proceeding. Moreover, the transcript of the August 24, 1994 evidentiary hearing in this case contains no objection to the omnibus proceeding. Additionally, in neither petitioner's pre-hearing nor post-hearing memoranda does

she voice any objection to the *ex parte* hearing. In fact, petitioner did not object to the taking of evidence at an *ex parte* proceeding anywhere in the entire record before the special master.

On review petitioner has objected that the special master did not follow his own order in finding that petitioner did not fall into the "typical pattern" for chronic rubella-associated arthropathy. *See* Motion for Review at 8 (Objection IV). In this objection, she states: "not only does [sic] the criteria of the January 11, 1993 Order not require any such 'typical pattern'.... but holding Mrs. Johnson to such a pattern is inconsistent with ... the spirit of the law...." *Id.* Even if this could, in some way, be taken as an objection to the omnibus proceeding, it is not "in the record *before the special master*" and is certainly not a specific objection to the taking of evidence at an *ex parte* hearing. Vaccine Rule 8(f). Therefore, any objection to the *ex parte* omnibus proceeding must be deemed waived pursuant to the Vaccine Rules.

Accordingly, the court may not and does not consider the propriety of the special master's actions in this regard. *See Weddel v. Secretary of Health and Human Servs.*, 23 F.3d 388, 390 n. 2 (Fed.Cir.1994); *McGowan v. Secretary of Health and Human Servs.*, 31 Fed.Cl. 734, 737 (1994); *McMillan v. Secretary of Health and Human Servs.*, 26 Cl.Ct. 357, 359 (1992).